MELINDA L. HAAG
United States Attorney
450 Golden Gate Avenue, Box 36055
San Francisco, CA 94102

JAMES E. WEAVER
ADAIR F. BOROUGHS
Trial Attorneys, Tax Division
U.S. Department of Justice
P.O. Box 683, Ben Franklin Station
Washington, D.C. 20044-0683
Telephone: (202) 305-4929
james.e.weaver@usdoj.gov
adair.f.boroughs@usdoj.gov

*Attorneys for the United States of America*

## IN THE UNITED STATES DISTRICT COURT FOR THE

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **JOHN LARSON** | ) **NO. C 11-03093-WHA** |
| **Plaintiff,** | ) |
| **v.** | ) |
| **UNITED STATES OF AMERICA,** | ) |
| **Defendant.** | ) |

## RESPONSE OF THE UNITED STATES

## TO PLAINTIFF'S COMPLAINT

# TABLE OF CONTENTS

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

I.   Introduction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

II.  Response to Plaintiff's Factual Allegations. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    A.   Background: Larson and his tax shelter business.  . . . . . . . . . . . . . . . . . .7

    B.   Larson not only promoted tax shelters; he participated in them and he failed to pay tax on millions of dollars in income that he (and his entities) earned. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    C.   Larson was convicted on twelve counts of tax evasion. . . . . . . . . . . . . . . 9

    D.   Larson evaded his tax liabilities during the 1998-20001 period. . . . . . . . 12

    E.   Mr. Larson's counsel failed to provide the IRS Appeals Office with current financial information for Mr. Larson. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

    F.   Mr. Larson's counsel has failed to provide the IRS with current financial information in connection with a promoter investigation.   . . . . . . . . . . 15

    G.   Mr. Larson continues to maintain his overseas accounts. . . . . . . . . . . . . 16

III. Legal Analysis. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

    A.   Jeopardy assessments. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

    B.   The limited scope of judicial review. . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

        1. Issue 1: Was the assessment reasonable under the circumstances. 18

        2.  Issue 2: was the amount of the assessment appropriate. . . . . . . . . 20

    C.   A wide range of evidence may be considered in the summary proceeding. . . . 21

    D.   Larson's criminal tax evasion activities, alone, provide the IRS with a reasonable basis for making a jeopardy assessment . . . . . . . . . . . . . . . .  21

    E.   Larson's brazen prior transfers of his assets to overseas trusts and accounts beyond the reach of the IRS afford the IRS a reasonable basis for making a

jeopardy assessment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

F.   Mr. Larson's actions may be reasonably construed as evidencing a present
intention to place his assets beyond the reach of the Government . . . .   23

G.   Other factors: Larson's role as a promoter of abusive
tax shelters . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

H.   The amount of the jeopardy assessments are
appropriate. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

IV.   Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

TABLE OF AUTHORITIES

**FEDERAL CASES**

*Bean v. United States*, 618 F. Supp. 652 (N.D. Ga. 1985). . . . . . . . . . . . . . . . . . . 14, 15,
16, 19

*Boyd v. United States*, 724 F. Supp. 1036 (D.D.C. 1989). . . . . . . . . . . . . . . . . . . . 3, 18

*Breen v. United States*, 49 A.F.T.R.2d 82-772 (N.D. Ga. 1981). . . . . . . . . . . . . . . . . 14

*Bremson v. United States*, 459 F. Supp. 121 (W.D. Mo. 1978). . . . . . . . . . . . . . . . . . 17

*Cantillo v. Coleman*, 559 F. Supp. 205 (D.N.J. 1983). . . . . . . . . . . . . . . . . . . . . 3, 14,
18

*Central De Gas De Chihuahua, S.A. v. United States*, 790 F. Supp. 1302
(W.D. Tex. 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Harvey*, 703 F. Supp. at 1104. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Harvey v. United States*, 730 F. Supp. 1097 (S.D. Fla. 1990). . . . . . . . . . . . . . . . 2, 14,
16

*Haskin v. United States*, 444 F. Supp. 299 (C.D. Cal. 1977). . . . . . . . . . . . . . . . . . 17

*Loretto v. United States*, 440 F. Supp. 1168 (E.D. Pa. 1977). . . . . . . . . . . . . . . . . . 14

*Magluta v. United States*, 952 F. Supp. at 798 (S.D. Fla. 1996). . . . . . . . . . . . . . . . 17

*McWilliams v. Commissioner*, 103 T.C. 416 (1994). . . . . . . . . . . . . . . . . . . . . 15, 17

*Miller v. United States*, 615 F. Supp. 781 (N.D. Ohio 1985). . . . . . . . . . . . . . . . . . 16

*Mueller v. Commissioner*, 882 F. Supp. 1060 (S.D. Fla. 1995). . . . . . . . . . . . . . . . 2, 3,
18

*Nolan v. United States*, 539 F. Supp. 788 (D. Ariz. 1982). . . . . . . . . . . . . . . . . . . 14

*Revis v. United States*, 558 F. Supp. 1071 (D. R.I. 1983). . . . . . . . . . . . . . . . . . . . 15

*Serpa v. United States*, 81-1 USTC ¶ 9323 (D. Neb. 1981). . . . . . . . . . . . . . . . . . . 16

*Settipane v. United States*, 352 F. Supp. 2d 27 (D. Mass. 2004). . . . . . . . . . . . . . 14, 15,
16, 20

*United States v. Pfaff*, 619 F.3d 172 (2d Cir. 2010), *cert denied*, 2011 WL
645257 & 675764 (U.S. Jun. 27, 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Varjabedian*, 339 F. Supp. at 157. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Varjabedian v. United States*, 339 F. Supp. 2d 140 (D. Mass. 2004). . . . . . . . . . 13, 14,
15, 16

*Wellek*, 324 F. Supp. 2d 905 (N.D. Ill. 2004). . . . . . . . . . . . . . . . . . . . . . . . 15, 16

*White v. United States*, 754 F. Supp. 66 (M.D. N.C. 1991). . . . . . . . . . . . . . . . . . . . . . 2, 18

*Young v. United States*, 617 F. Supp. 1340 (S.D. Fla. 1987). . . . . . . . . . . . . . . . . . . . . . 2

## DOCKETED CASES

*Lovana Farms, Inc. v. United States, Slip Op. at 30*, Civil No. C85-22-G
   (N.D. Ga. 1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 19

*Stein v. United States*, No. 05-cr-0888-LAK (Southern District of New York). . . . . 5, 6,
                                                                           7, 8,
                                                                           11

## FEDERAL STATUTES

26 C.F.R. 301.6231(c)-4. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

26 U.S.C. § 6213. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

26 U.S.C. §§6331(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

26 U.S.C. §§ 6331(a), 6861. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

26 U.S.C. 6404(g). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

26 U.S.C. §§6851, 6861.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

26 U.S.C. § 6861. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

26 U.S.C. § 7429(b)(3)(A). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 14,
                                                                             16

IRS Notice 2000-44. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5

S. Rep. No. 94-938, at 365 (1976), *reprinted in* 1976 U.S.C.C.A.N. 2897. . . . . . . . 14, 16,
                                                                                17

Title 26 U.S.C. § 7429(b).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Treas. Reg. 1.6851-1(a)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Treas. Reg. 301.6861-1(d). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

MELINDA L. HAAG
United States Attorney
450 Golden Gate Avenue, Box 36055
 San Francisco, CA 94102

JAMES E. WEAVER
ADAIR F. BOROUGHS
Trial Attorneys, Tax Division
U.S. Department of Justice
P.O. Box 683, Ben Franklin Station
Washington, D.C.  20044-0683
Telephone: (202) 305-4929
james.e.weaver@usdoj.gov
adair.f.boroughs@usdoj.gov

*Attorneys for the United States of America*

# IN THE UNITED STATES DISTRICT COURT FOR THE

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **JOHN LARSON** | ) **NO.  C 11-03093-WHA** |
| | ) |
| **Plaintiff,** | ) **RESPONSE OF THE UNITED STATES** |
| | ) **TO PLAINTIFF'S COMPLAINT** |
| v. | ) |
| | ) |
| **UNITED STATES OF AMERICA,** | ) |
| | ) |
| **Defendant.** | ) |

## I.    Introduction

John Larson, along with his colleague Robert Pfaff, masterminded one of the largest tax evasion schemes ever perpetrated against the United States.  On December 17, 2008, a jury found Larson guilty of twelve counts of tax evasion.  (*See* Judgment in *United States v. Jeffrey Stein*, *et al.*, S1 05 Cr. 888 (LAK) (S.D.N.Y.) (*Stein* case), attached to Declaration of James Weaver as Exhibit A; *see also* Tr. of Sentencing Hrg. on Apr. 1, 2009 at 67:1-4, attached to Weaver Decl. as Ex. C).  Shortly thereafter, Larson was sentenced to 121 months of imprisonment on account of having played a primary role in defrauding the United States of in excess of $100 million in tax revenues – and on account of having transferred millions of dollars to offshore trusts in order to place his assets beyond the reach of the United States and other potential creditors.  (Ex. A to

Weaver Decl. at 3; *see also* Ex. C to Weaver Decl. at 81:5-11).  At the sentencing hearing, the

Honorable Lewis A. Kaplan found that Larson's offshore transfers constituted "a brazen act."

(Ex. C to Weaver Decl. at 73:1-15).

As part of the criminal sentence, Judge Kaplan ordered Larson to pay a fine of

$6,000,000.  (Ex. A to Weaver Decl. at 6).  Larson paid the fine. (Ex. E to Weaver Decl.).  Along

with certain other defendants, Larson appealed his conviction.  The United States Court of

Appeals for the Second Circuit affirmed Mr. Larson's conviction; however, in a decision dated

August 27, 2010, the Second Circuit vacated the fine imposed by the federal district court, and

remanded the case for further proceedings.  *United States v. Pfaff*, 619 F.3d 172 (2d Cir. 2010),

*cert denied*, 2011 WL 645257 & 675764 (U.S. Jun. 27, 2011); *see also* Ex. F to Weaver Decl.

The Second Circuit found that the maximum fine permitted  pursuant to statute and the facts

reflected in the jury verdict was $3,000,000.  The parties anticipate that the Clerk for the United

States District Court for the Southern District of New York will likely refund at least $3,000,000

to Mr. Larson in the near future.

Upon learning of the impending refund, the IRS initiated a process that led to the making

of jeopardy assessments against Mr. Larson for unpaid tax obligations in excess of $10 million

for tax years 1998-2001 (almost $20 million, including interest).  The IRS then served a notice of

levy on the clerk of the court that will issue the refund.  Mr. Larson asks this Court to review the

jeopardy assessments.

Pursuant to statute, the Court's review of the jeopardy assessments is limited.  All that

needs to be determined is whether the assessments were "reasonable under the circumstances,"

and whether the amount assessed was appropriate.  26 U.S.C. § 7429(b)(3)(A).  Case law makes

clear that a taxpayer's involvement in illegal activity alone makes the use of a termination or

jeopardy assessment against that taxpayer a reasonable action.  *Mueller v. Commissioner,* 882 F.

Supp. 1060, 1062 (S.D. Fla. 1995)*; Harvey v. United States,* 730 F. Supp. 1097, 1106 (S.D. Fla.

1990); *White v. United States*, 754 F. Supp. 66, 68 (M.D. N.C. 1991); *Young v. United States*,

617 F. Supp. 1340, 1343 (S.D. Fla. 1987).  Here, there are further compelling grounds for

making jeopardy assessments with respect to Larson.  If a criminal, especially one convicted of

tax evasion, has previously transferred funds beyond the reach of the of the IRS, the IRS is fully justified in concluding that the criminal is predisposed to do so again.  *See Mueller,* 882 F. Supp. at 1062 (*citing Boyd v. United States*, 724 F. Supp. 1036 (D.D.C. 1989); *Cantillo v. Coleman*, 559 F. Supp. 205 (D.N.J. 1983)).  Under such circumstances, use of the jeopardy procedure to prevent delay of the assessment and collection of tax is reasonable and appropriate.  *Id*.

Prior to bringing this action, Mr. Larson's counsel had an opportunity to seek review of the jeopardy assessment through the administrative process.  The IRS Appeals Officer assigned to this review specifically requested, on March 16, 2011, that Mr. Larson's representative "be prepared to discuss and to provide supporting documentation regarding the taxpayer's specific assets that are currently within the reach of the U.S. Government."  (Declaration of James Hockett ¶ 5).  Mr. Larson's counsel provided no such information either before, or during, the appeals hearing held on March 23 and April 12, 2011.  (*Id*. at ¶ 6).

Mr. Larson is not a run-of-the-mill tax cheat.  He is highly sophisticated and knowledgeable with respect to tax and financial matters. His schemes were elaborate.  Larson actively engaged in large-scale efforts to defraud the United States.  He worked to conceal tax schemes from the IRS.  He has a history of utilizing offshore accounts and entities.

At issue in this summary proceeding is whether Mr. Larson will be afforded an opportunity to follow his earlier series of brazen asset transfers with yet another one, thereby placing the impending refund of a portion of his criminal fine beyond the reach of the United States.  Larson continues to owe sizeable tax obligations to the IRS.  The bulk of his ill-gotten earnings from his illegal tax shelter activities remains deposited overseas.  Under the circumstances, the actions of the IRS are more than reasonable and the Plaintiff's request for relief should be denied.

## II.    Response to Plaintiff's Factual Allegations

### A.    Background: Larson and his tax shelter business

1.    Mr. Larson, and his colleague Robert Pfaff, left the employ of accounting firm KPMG to establish Presidio Advisors LLC (and related entities) in 1997.  (Declaration of George Terpack at ¶ 5).  Ostensibly an investment advisory company, Presidio's near-exclusive business

was the design, marketing, and execution of individual tax shelters, primarily in conjunction with KPMG.  (*See* Terpack Decl. at ¶ 6).

2.     Over the course of approximately three years, various Presidio-related entities took in hundreds of millions of dollars in fees for executing these tax shelters, yielding tens of millions of dollars in profits directly and indirectly to Larson and Pfaff. (Terpack Decl. ¶ 7).

3.     As of January 31, 2000, Larson's personal net worth exceeded $21 million. (Ex. A to Terpack Decl.).

4.     One of the tax shelters designed and promoted by Presidio was known by the acronym "BLIPS."  BLIPS (bond linked issue premium structure) was designed to generate a purported tax loss without generating any corresponding economic loss.  The purported losses were generated by assigning an inflated tax basis to a taxpayer's partnership interest (through misuse of tax rules governing the assumption of liabilities).  (Terpack Decl. ¶ 9).  The gist of the tax scheme is described in IRS Notice 2000-44, published by the IRS in August 2000.  (Ex. G to Weaver Decl.).

5.     Larson, Pfaff and a third individual, David Amir Makov, disguised the BLIPS shelter as an investment program.  (*See* Tr. of Makov Guilty Plea Hrg. on Sept. 10, 2007 at 15:1 - 22:6, attached to Weaver Decl. as Ex. H).  But, as Larson made clear to Makov, the investment aspect of BLIPS was a mere pretext, and Larson knew that the shelter program lacked any real economic substance.  (*See id*.).  Makov later admitted that the entire program was calibrated to generate tax losses, and that the chances of earning a profit from BLIPS were akin to the purchase of a lottery ticket.  (*See id*.).  In addition, Larson and his colleagues structured the BLIPS program to conceal the true nature of the program from the IRS.  (*See id*.).

6.     Larson and Pfaff were the "prime movers" in the BLIPS scheme.  (Tr. of Sentencing Hrg. on Apr. 1, 2009 at 10:17-18, attached to Weaver Decl. as Ex. C).  The scheme was sold to numerous wealthy clients, resulting in a loss to the U.S. Treasury of well over $100 million. (Ex. C to Weaver Decl. at 64:10 - 65:17; *see also* Ex. H to Weaver Decl. at 21:17-23).

7.     BLIPS was one of a number of abusive schemes that purported to create tax basis through the used of certain types of liabilities that were assumed by partnerships (or other)

entities.  (Terpack Decl. ¶ 10).  Upon the sale of an asset with an inflated basis, the taxpayer would report a large tax loss.  (*Id*.)  As reflected by the issuance of Notice 2000-44 in August 2000, these schemes, upon discovery by the IRS, would be disallowed and would subject taxpayers to previously untaxed gain, potential penalties and interest liabilities, and the disallowance of deductions for large fees that the taxpayers paid to Presidio to enter into the transactions. (Ex. G to Weaver Decl.).

8.      With the proverbial handwriting on the wall, and facing the potential for a mass of civil litigation – as well as a serious risk of criminal prosecution for his promotion of abusive tax shelters, Larson "transferred millions of dollars to Channel Islands trusts in the Island of Guernsey." (Ex. C to Weaver Decl. at 73:8-14).   Judge Kaplan characterized Larson's efforts to transfer his assets out of the reach of the United States and other creditors as "a brazen act."  (*Id*.)

**B.     Larson not only promoted tax shelters; he participated in them and he failed to pay tax on millions of dollars in income that he (and his entities) earned.**

9.      Larson did not pay income tax on the millions that he earned through his promotion of abusive tax shelters.  Instead, he evaded paying taxes on millions of dollars of income through his own personal participation (direct and indirect) in a series of abusive tax shelters during the tax years at issue: 1998, 1999, 2000 and 2001.  (Terpack Decl. ¶ 11).

10.     The Government eventually discovered the tax shelter schemes that Larson and his colleagues had designed and promoted, and the IRS initiated audits of Larson and several of the business entities through which Larson promoted tax shelters and evaded payment of taxes on his own substantial income.  (Terpack Decl. ¶ 12).  Although the IRS gathered some information from Mr. Larson and his entities, the civil examination of Larson was frozen in 2004 upon the commencement of a criminal investigation of Mr. Larson's activities.  (*Id*.)

11.     The suspension of an IRS civil audit during the pendency of a criminal investigation helps to ensure that a taxpayer's Fourth Amendment and Fifth Amendment rights are not inadvertently violated during the course of a civil investigation.  (Terpack Decl. ¶ 13).

**C.     Larson was convicted on twelve counts of tax evasion**

12.     The United States filed a criminal case relating to some of the abusive tax shelters designed and promoted by Presidio and accounting firm KPMG in August 2005.  The case,

involving numerous defendants, including Mr. Larson, was captioned *Stein v. United States*, No. 05-cr-0888-LAK (Southern District of New York).

13.     At the conclusion of the trial in the *Stein* case, a jury found Mr. Larson guilty of twelve counts of tax evasion, all pertaining to his role in creating, promoting, and carrying out a tax shelter scheme known by the acronym "BLIPS." A copy of the final judgment against Mr. Larson filed on April 24, 2009 (Docket No. 1459) is attached as Ex. A to the Weaver Declaration.  The counts upon which Mr. Larson was convicted are detailed in a Superceding Indictment filed on October 17, 2005 (Docket Nos. 57 and 57-2).  (Ex. B to Weaver Decl.)  Mr. Larson's tax evasion involved fraudulent activities, the filing of false returns, and taking steps to conceal fraud from the IRS.

14.     The presiding judge in the *Stein* case, the Honorable Lewis A. Kaplan, held a sentencing hearing pertaining to Mr. Larson, among others, on April 1, 2009.  (Ex. C to Weaver Decl.).

15.     In connection with the sentencing hearing and at the direction of Judge Kaplan, counsel for Mr. Larson submitted a statement of Mr. Larson's net worth.  (Weaver Decl. ¶ 5).

16.     In connection with the sentencing hearing, Judge Kaplan ordered Mr. Larson to provide the Court with copies of certain trust instruments for the "Concorde and Traverse Trusts."  (Ex. D to Weaver Decl.).  Counsel for Mr. Larson submitted copies of these trust documents to the Court and to counsel for the Government in the criminal case.  (Weaver Decl. ¶ 6).

17.     At the request of Mr. Larson's counsel, Mr. Larson's net worth statement and the trust instruments requested by Judge Kaplan were submitted under seal.  (Weaver Decl. ¶ 7). Consequently, absent an appropriate court order, Government counsel in the criminal case are precluded from furnishing copies of these documents, or information contained within the documents, to either the Internal Revenue Service employees who may be examining Mr. Larson's tax returns or to civil trial counsel for the United States in this case.  (*Id.*)

18.     At the sentencing hearing held on April 1, 2009, Judge Kaplan characterized as "brazen" Larson's efforts to evade his creditors and the Government through the transfer of

millions of dollars overseas, beyond the reach of the Government.

> 1      First of all, I'm obliged to consider the nature and
> 2  circumstances of the offense.  In the case of Messrs. Larson
> 3  and Pfaff, they cooked up in significant portion this mass
> 4  produced scheme to cheat the government out of tax revenue for
> 5  the purpose of enriching themselves.  It's that simple.  As
> 6  I've indicated, I certainly appreciate the legitimate nature of
> 7  much tax planning.  These activities were way beyond that.
> 8      I also take into account in the case of Mr. Larson the
> 9  rather interesting fact that he transferred millions of dollars
> 10  to Channel Islands trusts in the Island of Guernsey after the
> 11  IRS issued its notice 2000-44, and thus, when the handwriting
> 12  was on the wall that he was going to be facing at an absolute
> 13  minimum a mass of civil litigation, and quite likely a serious
> 14  risk of criminal prosecution, this was a brazen act.

(Ex. C to Weaver Decl at 73:1-14).

19.     Indeed, it was Mr. Larson's brazen acts of placing his assets beyond the reach of the Government and other creditors, along with age differences in the defendants, that led Judge Kaplan to sentence Larson to a longer prison sentence than his confederate in crime, Robert Pfaff.  (Ex. C to Weaver Decl. at 81:5-11).

20.     Mr. Larson was sentenced to serve a 121 month term of imprisonment on account of his conviction in the *Stein* case. (Ex. A to Weaver Decl. at 3).

20.     Larson was also fined $6,000,000 on account of his conviction.  (*Id.* at 6).

21.     Larson paid this fine on or about August 5, 2009.  (Ex. E to the Weaver Decl.).

22.     The United States Court of Appeals for the Second Circuit affirmed Mr. Larson's conviction; however, in a decision dated August 27, 2010, the Second Circuit vacated the fine imposed by the federal district court, and remanded the case for further proceedings.  (Ex. F. to Weaver Decl.).  The Second Circuit found that the maximum fine permitted  pursuant to statute and the facts reflected in the jury verdict was $3,000,000.  (*Id.*)  On June 27, 2011, the United States Supreme Court denied Mr. Larson's petition for a writ of certiorari as to his conviction and sentence.

23.     Although the District Court has not yet entered an order reducing Mr. Larson's criminal fine, the IRS expects the Southern District of New York to refund at least $3,000,000 of the fine to Mr. Larson in the near future.

**D.     Larson evaded his tax liabilities during the 1998-2001 period**.

24.     Upon learning of the impending and likely refund to Mr. Larson of $3,000,000 in fines by the trial court, the IRS undertook a review process that led to the issuance of a Notice of Jeopardy Assessment to Mr. Larson on February 7, 2011, and a Notice of Levy (with respect to the pending refund) on February 8, 2011.  (Terpack Decl. ¶ 14).  The grounds for the making of the jeopardy assessments are contained in the Notice of February 7, 2011.

25.     As articulated in the Notice of Jeopardy Assessment, Mr. Larson owes in excess of $10 million in unpaid income tax liabilities, and an additional $9 million in interest, for tax years 1998-2001, mostly related to his participation in abusive tax shelter schemes. (Terpack Decl. ¶ 16).

26.     Subsequent to the issuance of the notices, the IRS has undertaken an additional examination of the tax years at issue.  (Terpack Decl. ¶ 17).  On April 4, 2011, the IRS issued a statutory notice of deficiency to Mr. Larson that explains the bases for not only the jeopardy assessments but also additional income tax deficiencies and $8,293,033.30 in fraud and negligence penalties that Mr. Larson owes.  (*Id.*; *see* Notice of Deficiency, attached as Ex. B to Terpack Decl.).

26.     The Notice of Deficiency for the 1998 year determined that  the taxpayer failed to report the following amounts:

a.     Ordinary income of $345,935 as a flow-through that resulted from the disallowance of a $11,881,813 loss on sale of equipment held by Presidio Advisors, LLC, a TEFRA entity;

b.     Ordinary dividend income of $36,370 that flowed through from Prevad, Inc., an S-corporation;

c.     Ordinary income of $3,450,170 that flowed through from Prevad, Inc., an S-corporation; and

d.     Net short-term capital gain $922,064 that flowed through to the taxpayer from JL Investment Trust, his trust, which had participated in a so-called "Son of Boss" transaction.

(Terpack Decl. ¶ 18).

27.   The $922,064 addition to income arises out of Larson's personal participation in two abusive tax shelters: a "CARDS" shelter and a Son-of-Boss sham transaction.  (Terpack Decl. ¶ 19).

28.   The $36,370 and the $3,450,170 additions to income from Prevad, Inc. arise out unreported income to the company.  (Terpack Decl. ¶ 20).

29.   The Notice of Deficiency for the 1999 year determined that the taxpayer failed to report the following amounts:

a.   Ordinary income of $8,915,329 as a distributive share that flowed through from Morley Inc., an S-corporation that had allocated its income to a disallowed ESOP;

b.   Ordinary income of $8,736,866 as a result of directly engaging in a corporate "BLIPS" transaction, which Mr. Larson engaged in through JL Investment Trust;

c.   Ordinary income of $ 1,124,749 that flowed through from Presidio Resources, LLC, a TEFRA partnership that had entered into "BLIPS" transactions, as a result of disallowed expenses claimed by Presidio Resources, LLC; and

d.   Ordinary income of $ 2,275,000 that the taxpayer received from Norwood Holding, Inc. into his bank account.

(Terpack Decl. ¶ 21).

30.   The $8,915,329 addition to income from Morley, Inc. arises out of Larson's personal participation in an abusive scheme to defer income into future tax years and to convert ordinary income into capital gains.  (Terpack Decl. ¶ 22).

31.    The $8,736,866 addition to income arises out of Larson's personal participation in an abusive BLIPS sham transaction arising out the sale of Prevad stock which had an inflated basis.  (Terpack Decl. ¶ 23).

32.   The Notice of Deficiency for the 2000 year determined that the taxpayer failed to report the following amounts

a.   Net capital gain of $2,114,443, as the result of a disallowed net short-term capital loss that flowed through from Torpre, Inc. as a result of Torpre, Inc.'s

13

participation in a "Son of Boss" transaction;

    b.    Ordinary income of $ 4,265,220, as a distributive share that flowed through from Morley Inc., an S-corporation that had allocated its income to a disallowed ESOP; and

    c.    Ordinary income of $683,016 that flowed through from Presidio Resources, LLC, a TEFRA partnership that had entered into a "BLIPS"-type "Son of Boss" transaction.

(Terpack Decl. ¶ 24).

    33.    The $2,114,443 gain arises out of Larson's personal participation in an abusive BLIPS sham transaction.  (Terpack Decl. ¶ 25).

    34.    The $4,265,220 addition to income from Morley, Inc. arises out of Larson's personal participation in an abusive scheme to defer income into future tax years and to convert ordinary income into capital gains.  (Terpack Decl. ¶ 26).

    35.    The Notice of Deficiency for the 2001 year determined that the taxpayer failed to report the following amounts:

    a.    Ordinary income of $6,750 that flowed through from Octavia Capital, LLC, a TEFRA entity;

    b.    Net capital gain of $598,456, as the result of a disallowed capital loss carryover from the taxpayer's Form 1040 for the 1999 tax year;

    c.    Ordinary income of $2,790,737 as a distributive share that flowed through from Morley Inc., an S-corporation that had allocated its income to a disallowed ESOP.

(Terpack Decl. ¶ 27).

    36.    The $2,790,737 addition to income from Morley, Inc. arises out of Larson's personal participation in an abusive scheme to defer income into future tax years and to convert ordinary income into capital gains.  (Terpack Decl. ¶ 28).

**E.    Mr. Larson's counsel failed to provide the IRS Appeals Office with current financial information for Mr. Larson.**

    37.    Mr. Larson's counsel requested an administrative review of the jeopardy assessment and levy on March 9, 2011.  (Pls. Ex. 4).

38.     The request for review was assigned to IRS Appeals Officer James Hockett. (Hockett Decl. ¶ 3).

39.     In a letter dated March 16, 2011, Mr. Hockett requested that Mr. Larson's counsel, Kevin Planneger, be prepared to discuss and to provide supporting documentation regarding the taxpayer's specific assets that are currently within the reach of the U.S. Government.  (Ex. A to Hockett Decl.).

41.     Mr. Hockett conducted a hearing for the taxpayer on March 23, 2011, and April 12, 2011.  (Hockett Decl. ¶ 6).

42.     Mr. Larson's representatives did not provide, at either of the hearings, information or supporting documentation regarding assets within the reach of the U.S. Government that Hockett had requested.  (Hockett Decl. ¶ 7).

43.     During the hearings, the taxpayer's representative admitted that the taxpayer owned and controlled two foreign trusts, named Concord and Traverse, and controlled foreign trust accounts on Guernsey Island.  (Hockett Decl. ¶ 8).

44.     As noted in the Complaint, IRS Appeals did not abate the assessments or release the levy.

**F.     Mr. Larson's counsel has failed to provide the IRS with current financial information in connection with a promoter investigation**.

45.     The IRS is investigating Mr. Larson in connection with his activities as a promoter of tax shelters.  Revenue Agent Kevin Banks is assigned to this investigation. (Declaration of Kevin Banks ¶ 3).

46.     On October 12, 2010, Mr. Banks provided a draft Information Document Request ("IDR") to the taxpayer's representative.  (Banks Decl. ¶ 5).

47.     On November 26, 2010, Banks faxed a final IDR to Mr. Larson's representative, Kevin Planegger.  (Banks Decl. ¶ 6).  Responses to the IDR were due January 7, 2011.  (*Id*.)  The IDR included requests for the fair market value of all offshore accounts, the fair market value of other assets, and other documents relevant to the taxpayer's financial position.  (*See* IDR, attached as Ex. A to Banks Decl.).

48.     On November 30, 2010, Mr. Banks verbally agreed to extend the due date for

responses to the IDR to January 26, 2011.  (Banks Decl. ¶ 7).

49.     On February 15, 2011, Banks again verbally agreed to extend the due date for responses to the IDR to March 17, 2011, 30 days from February 15, 2011.  (Banks Decl. ¶ 8).

50.     As of July 7, 2011, Mr. Banks has not received any information from the taxpayer (or his representatives) responsive to the IDR issued on November 26, 2011.  (Banks Decl. ¶ 9).

51.     In short, Mr. Larson has failed to cooperate with the IRS in connection with its investigations into the current financial positions of Mr. Larson.

**G.     Mr. Larson continues to maintain his overseas accounts**

52.     As reflected by recent reporting of foreign bank information, as of 2009, Mr. Larson maintained various foreign accounts that may have harbored in excess of $4 million in assets.  (*See* FBARs, attached as Ex. I to Weaver Decl.).  It is very unclear as to whether this includes assets that Mr. Larson may well have secreted in trusts or with friends.  As noted by Judge Kaplan

> 11   The defendants, given the relationship that was shown
> 12   at trial with the Norwegians, I think quite possibly have
> 13   access to substantial resources abroad in the hands of others.
> 14   Certainly Mr. Larson has direct access.  There are millions of
> 15   dollars in the Converse Trust sitting on the Isle of Guernsey.
> 16   He has the power under Article 1.2 of the trust instrument to
> 17   designate all of that principal to go to, among all other
> 18   people his sister, Ann Malner.

(Ex. C. to the Weaver Decl. at 106:11-18).

53.     As noted in the IRS Notice of Jeopardy Assessment (footnote 2 on p. 2), the "Norwegians" referred to by Judge Kaplan participated in abusive tax shelter schemes with Mr. Larson.  In short, a federal district judge has noted that Larson has the ability, means and connections to access funds overseas and engage in financial chicanery.  The IRS has every reason to accelerate the assessment process against Mr. Larson with respect to unpaid taxes on income derived from illegal promotion and participation in tax shelters.  This is especially so in light of the paltry domestic assets that the IRS has located through recent summonses (Ex. C to Terpack Decl.) and the failure of Mr. Larson's representatives to provide financial information requested concerning assets that may be within the reach of the IRS to Appeals Officer Hockett. (*See* Hockett Decl. ¶¶ 5-7; *see also* Banks Decl. ¶¶ 6-9).

54.     Given the evidence that Mr. Larson's net worth exceeded $21 million in January 2000 (Ex. A to the Terpack Declaration), the further evidence in the form of recent FBAR reports attached as Ex. I to the Terpack Declaration that reflect only about $4 million in overseas accounts, the lack of disclosure by counsel for Mr. Larson when asked to identify assets within the reach of the IRS, and the paltry amount of domestic assets turned up thus far by the IRS in recently-issued summonses, it is reasonable for the IRS to conclude that Larson has either hidden substantial assets overseas that have not been accounted for, or, alternatively, he has dissipated substantial sums of money at a time when he owes very sizeable tax obligations.  At a minimum, these factors create the appearance of concealment and/or dissipation in the face of a known tax liability.

## III.   Legal Analysis

Title 26 U.S.C. § 7429(b) provides for a summary judicial review of "jeopardy" and "termination" assessments by made the Internal Revenue Service (IRS) pursuant to 26 U.S.C. §§ 6851, 6861, or 6862 as well as "jeopardy" levies issued by the IRS pursuant to 26 U.S.C. §§ 6331(a) and (d)(3).  These provisions provide the IRS with alternative and immediate methods to assess and collect federal taxes in situations where the collection of tax may be jeopardized by the delay contained in routine procedures.  *See Varjabedian v. United States*, 339 F. Supp. 2d 140, 143 (D. Mass. 2004).  At issue here are jeopardy income tax assessments made pursuant to 26 U.S.C. § 6861.[1]

### A.  Jeopardy assessments

Under normal procedures, the assessment and collection of an unpaid income tax liability may not take place until ninety days after a notice of deficiency is mailed or, if a petition is filed in Tax Court, after a determination of the liability in Tax Court.  26 U.S.C. § 6213.  Furthermore, without a jeopardy determination, levies to collect an unpaid tax liability may not be made until the IRS provides a thirty-day notice in compliance with 26 U.S.C. § 6331(d).

---

[1]     Section 6851 governs termination assessments made for a tax year that has not yet ended or for which a tax return is not yet due.  Sections 6861 and 6862 govern jeopardy assessments made for tax years that have ended and for which the tax return due date has passed.  Section 6861 governs jeopardy assessments of income, estate, gift, and certain excise taxes.  Section 6862 governs jeopardy assessments of any other type of tax.

However, if the IRS believes that the assessment or collection of a tax will be jeopardized by delay, it can immediately assess the tax (together with interest), immediately demand payment, and immediately levy upon the taxpayer's property.  26 U.S.C. §§ 6331(a), 6861; Treas. Reg. 301.6861-1(d).

### B.    The limited scope of judicial review

Because of the sweeping authority given to the IRS by the jeopardy provisions of the Internal Revenue Code and because of the possibility of harsh results in a particular case, Congress enacted Section 7429 to provide summary judicial review, on an expedited basis. *Harvey v. United States,* 730 F. Supp. 1097, 1103 (S.D. Fla. 1990) (*quoting Breen v. United States*, 49 A.F.T.R.2d 82-772 (N.D. Ga. 1981)).

The scope of judicial review is specifically limited to two questions: (1) was the making of the jeopardy assessment reasonable under the circumstances and (2) is the amount of the assessment appropriate under the circumstances.  26 U.S.C. § 7429 (b)(3)(A); *Settipane v. United States*, 352 F. Supp. 2d 27, 30 (D. Mass. 2004).   The determination is not designed to establish the taxpayer's ultimate liability for the taxes that are at issue and has no effect on a determination of the correct tax liability by a court in a subsequent proceeding.  *Harvey*, 730 F. Supp. at 1103-04 (*quoting* S. REP. NO. 94-938, at 365 (1976), *reprinted in* 1976 U.S.C.C.A.N. 2897);  *Bean v. United States*, 618 F. Supp. 652, 659 (N.D. Ga. 1985).

### 1.    Issue 1: Was the assessment reasonable under the circumstances

"Reasonable under the circumstances" in Section 7429 "means something more than 'not arbitrary or capricious,' and something less than 'supported by substantial evidence'" *E.g. Harvey*, 730 F. Supp. at 1104 (S.D. Fla. 1990) (*quoting* S. REP. NO. 94-938, at 365 (1976), *reprinted in* 1976 U.S.C.C.A.N. 2897); *accord Settipane*, 352 F. Supp. 2d at 30; *Nolan v. United States*, 539 F. Supp. 788, 790 (D. Ariz. 1982); *Loretto v. United States*, 440 F. Supp. 1168, 1172 (E.D. Pa. 1977).

In determining reasonableness, courts generally consider whether one of three conditions found in Treas. Reg. 1.6851-1(a)(1) have been met:

> (i) The taxpayer is or appears to be designing quickly to depart from the United States or to conceal himself or herself.

(ii) The taxpayer is or appears to be designing quickly to place his...property beyond the reach of the Government either by removing it from the Untied States, by concealing it, by dissipating it, or by transferring it to other persons.

(iii) The taxpayer's financial solvency is or appears to be imperiled.

*Settipane*, 352 F. Supp. 2d at 30-31 (*citing Cantillo v. Coleman*, 559 F. Supp. 205, 206-07 (D. N.J. 1983)); *Varjabedian v. United States*, 339 F. Supp. 2d 140, 155 (D. Mass. 2004).  If any one of these three conditions are found to exist, the making of the assessment and the issuance of the levy is considered reasonable.

The Court's analysis, however, is not "in any way, shape or form restricted" to the three conditions contained in the Treasury Regulations.  *Varjabedian*, 339 F. Supp. 2d at 155 (*quoting Revis v. United States*, 558 F. Supp. 1071, 1071 (D. R.I. 1983)); *see also McWilliams v. Commissioner*, 103 T.C. 416, 423 (1994)(stating that the IRS "typically" relies on one of the three conditions listed in the Treasury Regulations).[2]

"A taxpayer's involvement in illegal activity **alone** is sufficient to warrant the use of a  . . . jeopardy assessment."  *Harvey*, 730 F. Supp. at 1106 (emphasis added); *White v. United States*, 754 F. Supp. 66, 68 (M.D. N.C. 1991); *Young v. United States*, 617 F. Supp. 1340, 1343 (S.D. Fla. 1987), *but see Snyder v. United Sates,* 55 A.F.T.R. 2d 85-1068 (D. Md. 1984)(holding conviction not sufficient by itself when jeopardy assessment was made four years after conviction and the IRS gave no explanation for the delay).  Involvement in illegal activity shows the reasonableness of a jeopardy assessment because it is suggestive of the three conditions listed in the Treasury Regulations.  *Guillaume v. Commissioner*, 290 F. Supp. 2d 1349, 1353-54 (S.D. Fla. 2003).  In particular, courts have held that involvement with criminal **tax** violations justify the making of jeopardy assessments.  *See Harvey*, 730 F. Supp. at 1107; *see also Mueller v. Commissioner,* 882 F. Supp. 1060, 1062 (S.D. Fla. 1995)(holding jeopardy assessments reasonable when taxpayer was convicted of tax evasion and bank fraud).

Courts have also looked to a number of other factors in determining whether a jeopardy assessment is reasonable under the circumstances.  Among the additional factors found in the

---

[2]	Plaintiff mis-cites the *McWilliams* case for the proposition that the three conditions in the regulation are exclusive conditions.  (Complaint ¶ 26).  The case does not stand for that proposition, and other cases stand for the contrary proposition.

case law are (1) dissipation of assets through forfeiture, expenditures for attorneys' fees, and other expenses, (2) a lack of assets from which a tax liability can be collected, (3) failing to provide appropriate financial information upon request, (4) control of bank accounts containing liquid funds, (5) the control of numerous business entities, (6) the maintenance of foreign bank accounts, and  (6) taking large amounts of money offshore.  *Settipane*, 352 F. Supp. 2d at 30-31; *Wellek*, 324 F. Supp. 2d 905, 912 (N.D. Ill. 2004); *Bean*, 618 F. Supp. at 658.

Courts have also held that involvement in the promotion and sale of abusive tax shelters supports the conclusion that a taxpayer is "capable of, and willing to, avoid taxes by any method."  *See Bean,* 618 F. Supp. at 658, *(citing Lovana Farms, Inc. v. United States*, Slip Op. at 30, Civil No. C85-22-G, (N.D. Ga. 1985)).

As the plain text of the regulations make clear, **appearances** are what count.  *See e.g., Miller v. United States*, 615 F. Supp. 781, 786 (N.D. Ohio 1985)("In order to establish that the making of a jeopardy assessment is reasonable under the circumstances, the Service need only establish that the taxpayer's circumstances *appear* to be jeopardizing collection of a tax–not whether they definitely do so.")(emphasis in original)(internal quotations omitted); *Bean*, 618 F. Supp. at 658 ("Whether Bean in fact intended to depart the country, liquidate his assets and thereby avoid payment of his taxes is irrelevant."); *accord Varjabedian*, 339 F. Supp. 2d at 155; *Wellek*, 324 F. Supp. 2d at 911.  Furthermore, because jeopardy assessments are made quickly to counter the apparent attempts of taxpayers to conceal assets, "it is not essential that every fact upon which the [IRS'] determination is based be proven accurate . . . for that determination to be reasonable under § 7429."  *Serpa v. United States*, 81-1 U.S.T.C. ¶ 9323 (D. Neb. 1981).

The United States bears the burden of proving that a jeopardy assessment was reasonable under the circumstances.  26 U.S.C. § 7429(g)(1).

**2.  Issue 2: was the amount of the assessment appropriate**

The amount assessed by the IRS is presumed appropriate.  *Bean*, 618 F. Supp. at 658, 659 (*citing* S. REP. NO. 94-938, at 365 (1976), *reprinted in* 1976 U.S.C.C.A.N. 2897, 3795); *accord Wellek,* 324 F. Supp. 2d at 913; *Varjabedian*, 339 F. Supp. at 157.  The burden is on the taxpayer

to show that the method of calculating the assessment is "fatally defective, irrational, arbitrary, or unsupported." *Settipane*, 352 F. Supp. 2d at 31 (*quoting Wellek*, 324 F. Supp. 2d at 913-14).

### C.   A wide range of evidence may be considered in the summary proceeding

Because a Section 7429 proceeding is a summary proceeding, rather than a full evidentiary hearing, the United States may present, and the Court is entitled to rely on, evidence that might be inadmissible under the Federal Rules of Evidence. *Varjabedian*, 339 F. Supp. 2d at 144; *Wellek*, 324 F. Supp. 2d at 911; *Harvey*, 730 F. Supp. at 1104. Such evidence on which a court can rely includes affidavits containing Government agents' conclusions and opinions. *Central De Gas De Chihuahua, S.A. v. United States*, 790 F. Supp. 1302, 1304 (W.D. Tex. 1992) (*citing Bremson v. United States*, 459 F. Supp. 121, 127 & 128 (W.D. Mo. 1978)); *McWilliams v. Commissioner*, 103 T.C. 416, 422 (1994).

In determining whether the assessment is reasonable and the amount assessed is appropriate, the Court "is to take into account not only information available to the Internal Revenue Service on the assessment date, but also any other information which bears on the issues before it." *Haskin v. United States*, 444 F. Supp. 299, 304 (C.D. Cal. 1977) (*citing* S. Rep. No. 94-938 at 365); *see also Magluta v. United States*, 952 F.Supp. 798, 801 (S.D. Fla. 1996); *Harvey*, 703 F.Supp. at 1104.

### D.   Larson's criminal tax evasion activities, alone, provide the IRS with a reasonable basis for making a jeopardy assessment

As noted above, a taxpayer's involvement in illegal activity **alone** is sufficient to warrant the use of a . . . jeopardy assessment." *Harvey*, 730 F. Supp. at 1106 (emphasis added). Mr. Larson's illegal activities in connection with the BLIPS shelter were notable for their complexity and sophistication. Larson is not a garden-variety criminal. As noted by Judge Kaplan, he has a web of connections with overseas individuals and entities. He not only facilitated the filing of fraudulent returns by other wealthy clients; he was found guilty of tax evasion with respect to the fraudulent BLIPS-generated losses that he claimed in his 1999 tax return. Yet, as reflected in the transcript for his 1999 tax year attached as Exhibit 2 to his Complaint, Larson has yet to pay a penny of the additional tax he owes for that year, notwithstanding the reality that he has millions secreted in overseas accounts. There is no evidence that Larson has repatriated the wealth that he

placed out of reach of the Government and other potential creditors (with the possible exception

of his payment of the criminal fine imposed by Judge Kaplan) after having been ordered by Judge

Kaplan to provide the Court with details regarding his overseas trust.  Indeed, as noted in

paragraph 54, above, Larson's actions and activities create the appearance that he is either hiding

additional millions overseas and/or he has dissipated millions of dollars in the face of known,

sizeable outstanding tax liabilities.

**E.**      **Larson's brazen prior transfers of his assets to overseas trusts and accounts beyond the reach of the IRS afford the IRS a reasonable basis for making a jeopardy assessment**

As noted above, if a criminal, convicted of tax evasion, has previously transferred funds

beyond the reach of the of the IRS, the IRS is fully justified in concluding that the criminal is

predisposed to do so again.  *See Mueller v. Commissioner,* 882 F. Supp. 1060, 1062 (S.D. Fla.

1995) (*citing Boyd v. United States*, 724 F. Supp. 1036 (D.D.C. 1989); *Cantillo v. Coleman*, 559

F. Supp. 205 (D.N.J. 1983)). Under such circumstances, use of the jeopardy procedure to prevent

delay of the assessment and collection of tax is reasonable and appropriate.  *Id*.

In this case, the IRS need look no further than the clear and unequivocal statements by

Judge Kaplan to find a reasonable basis for making a jeopardy assessment.  Judge Kaplan not

only concluded that Larson had brazenly transferred assets beyond the reach of the Government

and his creditors in the face of impending and inevitable civil litigation and risks of criminal

prosecution; he alluded to Larson's potential to utilize a network of overseas confederates (the

"Norwegians") for his financial benefit.

The IRS need not have concrete proof that the taxpayer actually has *current* plans to

dispose of or dissipate the assets.  In *White v. United States*, the court considered whether

jeopardy assessment against the taxpayer, who had been convicted of embezzlement, was

appropriate.  754 F.Supp. 66 (M.D.N.C. 1991).   In determining that jeopardy assessment was

both reasonable and appropriate, the court considered the taxpayer's *potential* to transfer her

assets:

> The Government is of the opinion that the plaintiff's remaining assets could be
> easily transferred or dissipated, making it virtually impossible for the Government
> to receive tax money.  This conclusion has merit because plaintiff has placed all of
> the embezzled funds beyond governmental reach.  The court agrees with the

22

1        Government that the plaintiff's remaining assets which include a retirement
2   account and an automobile . . . can be easily transferred or dissipated.

*Id.* at 68.

3        The potential for Mr. Larson to rapidly move the impending refund of a significant
4   portion of his criminal fine overseas is simply beyond dispute.

5        **F.**    **Mr. Larson's actions may be reasonably construed as evidencing a present**
6               **intention to place his assets beyond the reach of the Government**

7        Larson has admitted to controlling foreign accounts on Guernsey Island, a noted tax
8   haven. (*See* Hockett Decl. ¶ 9). It appears that Mr. Larson continues to control millions of
9   dollars in overseas accounts that are effectively beyond the reach of the Government. (Ex. I to
10  Weaver Decl.). His failure to repatriate assets, or to even provide the IRS with current financial
11  information as to assets within the reach of the Government,  notwithstanding repeated requests
12  over the past ten months, leads to the reasonable inference that Larson may very quickly move
13  any large refund that he receives out of reach of the Government. (*See* Declarations of Hockett
14  and Banks). This inference is even more reasonable when one considers that Larson has
15  continued to avoid paying substantial taxes owed for the 1998-2001 tax years – taxes arising out
16  of his participation in tax shelters that he, of all persons, understands to have been mere shams.
17  At a minimum, these factors reasonably create the appearance that Larson continues to intend to
18  evade collection of taxes owed. And it is appearances that count in this determination. *See*
19  *Bean*, 618 F. Supp. at 658.

20       **G.**    **Other factors: Larson's role as a promoter of abusive tax shelters**

21       As noted above, courts have also held that involvement in the promotion and sale of
22  abusive tax shelters supports the conclusion that a taxpayer is "capable of, and willing to, avoid
23  taxes by any method." *See Bean,* 618 F. Supp. at 658, *(citing Lovana Farms, Inc. v. United*
24  *States,* Slip Op. at 30, Civil No. C85-22-G, (N.D. Ga. 1985)). Mr. Larson, through Presidio,
25  perpetrated a string of highly complex and sophisticated fraudulent tax schemes over the course
26  of several years. It is certainly reasonable to conclude that he will continue to employ any means
27  to avoid paying his very sizeable tax obligations. Larson is a sophisticated individual who
28  clearly understands the legal implications of placing money in accounts overseas. His prior and

continuing acts demonstrate that the Taxpayer has the potential, the ability, the willingness, and propensity to continue to move, hide, and keep his assets overseas.

**H.     The amount of the jeopardy assessments are appropriate**

The declaration of Revenue Agent Terpack, and the statutory notice of deficiency attached to Mr. Terpack's declaration (Ex. B) provide well-reasoned and clear support for the amounts assessed on February 7, 2011 through the jeopardy procedure.  Mr. Terpack has identified specific items of unreported income, improper losses arising out of several abusive shelters, and other adjustments.  Indeed, the statutory notices, prepared subsequent to the jeopardy assessment, have identified additional income tax deficiencies over and above those included in the jeopardy assessments.  The statutory notices also address the issue of penalties owed by Mr. Larson.

In light of the Government having provided a reasoned explanation for the amounts of the jeopardy assessments, the burden is on the taxpayer to show that the method of calculating the assessment is "fatally defective, irrational, arbitrary, or unsupported." *Settipane*, 352 F. Supp. 2d at 31, *quoting Wellek*, 324 F. Supp. 2d at 912.  That is a burden that the Plaintiff cannot meet.

It is worth noting that Larson's Complaint contains several misleading or inaccurate allegations regarding his tax liabilities for the years at issue.

Larson contends that the "majority of the adjustments made by the IRS" are merely disputes about "the appropriate timing for [Larson] to have reported certain income; not whether he failed to report the income at all." (Complaint ¶ 17).  This is misleading for several reasons. First, the only adjustments that fit this description relate to income adjustments concerning the allocation of income to shareholders of Morley, Inc., an "S" corporation.  (Terpack Decl. ¶¶ 21a, 24b, 27c).  Second, the Morley adjustments arise out of Larson's personal participation in an abusive scheme to defer income into future tax years and to convert ordinary income into capital gains.  (*Id*. at ¶¶ 22, 26 28).  The scheme mis-allocated taxable income that should have passed through to Larson (and that he should have reported on his 1999, 2000 and 2001 tax returns) to a non-taxable "shareholder" instead.  The non-taxable shareholder could absorb income without consequence.  It is true that, upon the sale of Morley in a later tax year (not at issue here),

Larson's cost basis would be lower than it would have been had he been properly allocated income during the 1999-2001 tax years, and his lower cost basis would have resulted in greater capital gains on the sale of his stock in that later year.  But as to the years at issue, the IRS determination is correct.  Moreover, Larson's effort to improperly defer income and convert ordinary income into capital gain is not a mere matter of appropriate timing.  It is a matter of tax evasion.

Larson also creates the impression that his tax deficiencies are in dispute in partnership-level actions pending in the Court of Federal Claims.  Although the undersigned counsel for the Government have not been able to confer with the Department of Justice attorney handling those matters (who is not available this week), the undersigned counsel believe that only two of the adjustments reflected in the jeopardy assessments pertain to these pending actions.  Moreover, the making of a jeopardy assessment with respect to a tax liability arising out of a partnership item converts that item into a non-partnership item, thereby making any determination as to that item a matter for the partner to individually pursue.[3]  *See* 26 C.F.R. 301.6231(c)-4.

Larson also contends that he is entitled to abatement of interest pursuant to 26 U.S.C. 6404(g).  This is a complex provision, but it is important to note that § 6404(g)(2)(B) of that statute provides that abatement is not applicable in a case involving fraud.

Finally, Larson intentionally hid his tax evasion for the years at issue behind a tangled web of business entities.  To descend into a detailed examination of the particular tax shelter items would involve far more time and scrutiny than would be appropriate for a summary proceeding of the nature contemplated under § 7429.  This is not the forum for Mr. Larson to litigate the substance (or lack thereof) of his numerous tax schemes.  Mr. Terpack's explanations

---

[3]     The tax shelters that Larson (through Presidio) promoted were not merely just over the proverbial line separating legitimate tax planning from illegitimate tax planning.  To the contrary, shelters such as the Presidio-created BLIPS program that Larson promoted and participated in were outrageous schemes, lacking any credible investment purpose, and solely designed to defraud the United States.  A description of BLIPS and other shelters involving Presidio and Larson can be found in a report prepared by the minority staff of the Permanent Subcommittee on Investigations, entitled U.S. Tax Shelter Industry: the Role of Accountants, Lawyers and Financial Professionals.  *See* http://www.gpo.gov/congress/senate/senate12cp108.html (S. Prt. 108-34),  pp. 5-6; 36-37, 81-84 (discussing Presidio) and Appx. A (describing BLIPS).

regarding the amounts assessed more than meets the required standard under the statute.
(Terpack Decl. ¶¶ 17-28).

**IV.    Conclusion**

For the reasons set forth above, the jeopardy assessments were reasonable under the circumstances and the amounts assessed were appropriate.  Judgment should be entered in favor of the United States.


Dated: July 8, 2011



MELINDA L. HAAG
United States Attorney


*/s/James E. Weaver*
James E. Weaver
Adair F. Boroughs
Trial Attorneys, Tax Division
U.S. Department of Justice
P.O. Box 683, Ben Franklin Station
Washington, D.C.  20044-0683
Telephone: (202) 305-4929

**CERTIFICATE OF SERVICE**

It is hereby certified that service of this Response has been made this 8th day of July, 2011 by the CM/ECF system and also by placing copies in the United States mail in postage prepaid envelopes addressed to the following:

Ted Merriam
Kevin Planegger
MERRIAM LAW FIRM, P.C.
1625 Broadway, Suite 770
Denver, CO 80202

and

Steven M. Bauer
Margaret A. Tough
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111-6538

Attorneys for Plaintiff

/s/ James E. Weaver
Trial Attorney
United States Department of Justice