# EXHIBIT H

```
                          09_10_07 Makov Plea
                                                                    1
     79atmakp              Plea
 1   UNITED STATES DISTRICT COURT
 1   SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x
 2
 3   UNITED STATES OF AMERICA,
 3
 4            v.                         05 CR 888 (LAK)
 4
 5   DAVID AMIR MAKOV,
 5
 6                 Defendant.
 6
 7   ------------------------------x
 7
 8                                       New York, N.Y.
 8                                       September 10, 2007
 9                                       11:35 a.m.
 9
10
10   Before:
11
11                HON. LEWIS A. KAPLAN,
12
12                                       District Judge
13
13
14                     APPEARANCES
14
15   MICHAEL J. GARCIA
15        United States Attorney for the
16        Southern District of New York
16   JOHN HILLEBRECHT
17   MARGARET GARNETT
17        Assistant United States Attorneys
18
18   KIRKLAND & ELLIS
19        Attorneys for Defendant
19   JAY P. LEFKOWITZ
20   MARK C. HOLSCHER
20   ANDREW GENSER
21   ZACHARY BREZ
22
23
24
25
                  SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300
                                                                    2
     79atmakp              Plea
 1           (Case called)
 2           MR. HILLEBRECHT:  Good morning, your Honor, John
 3   Hillebrecht and Margaret Garnett for the government.
 4           THE COURT:  Good morning.
 5           MR. LEFKOWITZ:  Good morning, your Honor, Jay
 6   Lefkowitz, Mark Holscher, Andrew Genser and Zachary Brez from
 7   Kirkland & Ellis along with Mr. Makov.
 8           THE COURT:  Good morning.
 9           I understand your client intends to plead guilty,
10   Mr. Lefkowitz; is that right?
11           MR. LEFKOWITZ:  That's correct, your Honor.
12           THE COURT:  Andy, please swear the defendant.
                              Page 1
```

```
                        09_10_07 Makov Plea
 9    and to effect its illegal objects, in or about September or
10    October 1999, meet with Dominick DeGiorgio, Robert Pfaff and
11    John Larson at the offices of HB Bank in the Southern District
12    of New York?
13             THE DEFENDANT:  Yes, I did, your Honor.
14             THE COURT:  Did you, in furtherance of the conspiracy
15    and to further its illegal objects, between in or about April
16    and September 1999, together with John Larson and others,
17    prepare a written loan premium rationale that was designed to
18    falsely make it appear that there were legitimate business and
19    economic purposes for structuring the so-called BLIPS purported
20    loan in the manner in which it was structured with full
21    knowledge that there were no such legitimate business or
22    economic purposes for that structure?
23             THE DEFENDANT:  Yes, I did.
24             THE COURT:  Did you, in furtherance of the conspiracy
25    and to effect its illegal objects, on or about September 13th,
                    SOUTHERN DISTRICT REPORTERS, P.C.
                             (212) 805-0300
```

                                                                     14

```
      79atmakp                    Plea
 1    2004, in the Southern District of New York, make false or
 2    misleading statements to special agents of the IRS in an effort
 3    to mislead them into believing that there were legitimate
 4    business and economic purposes for structuring the BLIPS
 5    transaction in the manner in which it was structured with full
 6    knowledge that there were no such legitimate business or
 7    economic purposes for that structure or that the true reason
 8    for that structure was to generate a tax loss?
 9             THE DEFENDANT:  Yes, I did, your Honor.
10             THE COURT:  Did you, in furtherance of the conspiracy
11    and to effect its illegal objects, on or about July 11 and 12,
12    2005, provide false and misleading testimony under oath to
13    attorneys from the Civil Enforcement Section of the Tax
14    Division of the U.S. Department of Justice in an effort to
15    mislead them into believing there were legitimate business and
16    economic purposes for structuring the BLIPS transaction in the
17    manner in which was structured with full knowledge that there
18    were no such legitimate business or economic purposes for that
19    structure, and that the true reason for that structure was to
20    generate a tax loss?
21             THE DEFENDANT:  Yes, I did, your Honor.
22             THE COURT:  Tell me in your own words what you did
23    that in your mind makes you guilty of the crime charged.
24             THE DEFENDANT:  I will read a statement that I
25    prepared.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                             (212) 805-0300
```

                                                                     15

```
      79atmakp                    Plea
 1             In late 1998, when I was working at a hedge fund
 2    located in New York City, I was put in touch with John Larson
 3    and Robert Pfaff of Presidio Advisers through contacts at the
 4    bank that is being referred to as Bank A about working a tax
 5    shelter transaction I later learned was called BLIPS.  As a
 6    result of that contact and after several conversations and
 7    meetings in New York City, I joined John Larson and Robert
 8    Pfaff as a partner at Presidio Advisory Services in the spring
 9    of 1999 to work on BLIPS transactions.
10             I understood that BLIPS was a transaction designed to
11    shelter income from taxes for high net worth U.S. individuals.
12    Although it was not my initial intention to engage in a fraud
13    when I first explored working on BLIPS, I soon learned that
```

```
                         09_10_07 Makov Plea
14      BLIPS was based on false representations and bogus financing
15      arrangements designed to make it appear as if there were a
16      legitimate non-tax business purpose for doing the deals.  In
17      fact, there were none.  Generating paper losses and large fees
18      for the participants, including myself, was the sole purpose
19      for the transactions.  I participated in BLIPS knowing this to
20      be true and I agreed with others to use BLIPS to deceive the
21      IRS and evade taxes.
22                In my discussions with John Larson, Robert Pfaff, R.J.
23      Ruble, representatives of Bank A and of KPMG, some of whom are
24      listed in this indictment, I learned about the fraudulent
25      nature of BLIPS.  It was explained to me that a premium loan
                     SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300
                                                                    16
        79atmakp                  Plea
1       could be used to generate a paper loss by dropping the proceeds
2       into an LLC and then exiting the LLC.  It was also explained to
3       me that BLIPS had to have the appearance of economic substance,
4       which I was told means a business purpose other than taxes or a
5       chance to make a cash-on-cash return net of all fees.  In the
6       BLIPS transactions there was no economic substance.  Instead,
7       we created an appearance of economic substance rather than the
8       reality.
9                 As part of the deception, I was asked to come up with
10      an investment program that used only a small fraction of the
11      equity that the taxpayer would contribute to BLIPS partnership
12      and had the potential to generate a cash-on-cash return.  I was
13      expressly told by John Larson, Robert Pfaff and representatives
14      of Bank A, and it was clearly understood by R.J. Ruble and KPMG
15      representatives that the premium loan could not be placed at
16      risk nor could we risk more than a small portion of the equity
17      contributed by the client.  This was because our fees came out
18      of the remainder of the equity portion.  In fact, all fees
19      generated from the BLIPS transaction were calculated as a
20      portion of the tax savings.
21                THE COURT:  Can I interrupt you there?  Because I want
22      to make sure I heard something that you said a moment ago.
23                Could you go through the part again about what you
24      were instructed?
25                THE DEFENDANT:  I was expressly told by Larson, Pfaff,
                     SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300
                                                                    17
        79atmakp                  Plea
1       and representatives of Bank A, and it was clearly understood by
2       R.J. Ruble and KPMG representatives that the premium loan could
3       not be placed at risk nor could we risk more than a small
4       fraction of the equity contributed by the client.  This was
5       because our fees came out of the remainder of the equity
6       portion.  In fact, all fees generated from the BLIPS
7       transaction were calculated as a portion of the tax savings.
8                 THE COURT:  The portion I was focused on was just
9       before what you read back.
10                THE DEFENDANT:  Sorry.  As part of the deception I was
11      asked to come up with an investment program that used only a
12      small portion of the equity that the taxpayer would contribute
13      to the BLIPS partnership and had the potential to generate a
14      cash-on-cash return.
15                THE COURT:  That's the question.  You were attempting
16      to develop something that in fact had the potential to generate
17      a return?
18                THE DEFENDANT:  Yes, the ability to generate a
```

                         09_10_07 Makov Plea
19   cash-on-cash return did exist, however, the driver of that
20   cash-on-cash return had nothing to do with the financing
21   arrangement which created the tax benefit.
22             In fact, think about it the following way:  You have
23   this large transaction that creates a tax loss and then you
24   take a very small portion of your fees and buy a lottery
25   ticket.  Could you have made money on your lottery ticket?
                   SOUTHERN DISTRICT REPORTERS, P.C.
                             (212) 805-0300

                                                                    18
     79atmakp                 Plea
1    Yes, you could, but did you really need to do this whole
2    transaction to take five cents and buy a lottery ticket?
3    That's the analogy of what we created.
4              The foreign exchange contracts that in effect did have
5    the potential of making a cash-on-cash return -- a very small
6    potential but it did have that chance -- had nothing to do with
7    the circular nature of the loan which drove the tax benefit
8    which was the reason people did the deal.
9              THE COURT:  All right.  Go ahead.
10             THE DEFENDANT:  According to the instructions given,
11   we used only a small portion of the client's equity
12   contribution to speculate on the devaluation of the currencies
13   of the Argentine peso and the Hong Kong dollar.  I believed
14   that both currencies would eventually devalue, but I also knew
15   that there was only a very small chance they would devalue
16   within the few months that the BLIPS transactions would be in
17   place.  I told Larson and many representatives of KPMG at a
18   meeting in Dallas in the spring of 1999 that there was only a
19   very small chance that the BLIPS investment could make a profit
20   and that it was far more likely that the client would lose all
21   of his or her money in the investment.
22             The bank faced a very small risk of losing money if
23   the foreign currency we bet on went up instead of down in value
24   relative to the dollar, but that risk was in the foreign
25   exchange currency contracts, not the loan.  The bank insured
                   SOUTHERN DISTRICT REPORTERS, P.C.
                             (212) 805-0300

                                                                    19
     79atmakp                 Plea
1    that it could not lose money on those contacts by buying
2    foreign exchange options and forwards and thus eliminating the
3    risks of the foreign currency bets.
4              The loan itself was unnecessary and unconnected to the
5    investment program.  In fact, the loan was a circular
6    transaction because the proceeds never left the bank, they were
7    always under the control of the bank and could not be placed at
8    risk.
9              Since the bogus loans generated the tax loss, we had
10   to make it look as if the loan was to be used in the investment
11   component of the BLIPS transaction.  In fact, it was well
12   understood by me, Larson, Pfaff, Ruble, representatives of Bank
13   A and representatives of KPMG that the loan had nothing to do
14   with the investment.  Indeed, the investment component was
15   merely tacked on to the BLIPS structure to deceive the IRS.
16             Working with John Larson, Robert Pfaff,
17   representatives of Bank A and KPMG, I helped conceal the fact
18   that the loan proceeds were not connected to the investment
19   program and to falsely represent BLIPS as a seven-year
20   investment program that needed the loan in order to be
21   successful.  We did a number of things to try and conceal those
22   facts, including the following:
23             We created documentation that made it appear that
                                Page 9

```
                       09_10_07 Makov Plea                           20
24     BLIPS could last up to seven years and that the loan was needed
25     and used for the foreign currency play where we all knew those
                     SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

       79atmakp                   Plea
 1     things were false.
 2             We built in certain features to ensure that taxpayers
 3     would exit by year end, such as acquiring additional capital
 4     contributions to proceed to the next stages in making sure the
 5     banks could effectively force them out of the program.
 6             We drafted a credit agreement for BLIPS for the
 7     expressed purpose of hiding the fact that the bank's fees were
 8     directly related to the amount of tax loss to be generated.  We
 9     split up the bank fees into various components, but the premise
10     was that bank fees would roughly be equal to the 125 basis
11     points of the premium amount which was also the tax loss
12     desired by the client.  In fact, all the fees were calculated
13     as a percentage of the desired tax loss.  We also made it
14     appear as if we could use the loan proceeds to invest in a
15     variety of securities when it was understood that it could only
16     be the type of foreign currency plays I described earlier.
17             Larson, Pfaff, Ruble, representatives of banks and of
18     KPMG and I all understood that in order for the taxpayer to get
19     the tax benefit for the income he wished to shelter that year
20     he must exit the partnership the same year.  That is why
21     essentially every BLIPS client exited the supposedly seven-year
22     program after approximately 60 days as we planned and expected.
23             In addition, I worked with Larson, Pfaff,
24     representatives of KPMG to help hide the fraudulent BLIPS
25     losses.  For example, we used stocks that had declined in value
                     SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300
                                                                     21
       79atmakp                   Plea
 1     to mislead the IRS into thinking the losses came from a
 2     legitimate stock investment rather than from BLIPS.
 3             A centerpiece of BLIPS was the shared intent to
 4     deceive the IRS.  Key components of this deception were opinion
 5     letters issued by KPMG, R.J. Ruble and others, as well as
 6     various other documents, including representation letters from
 7     various participants.  Along with Larson, Pfaff, Ruble,
 8     representatives of KPMG and Bank A and others, I understood
 9     that these documents would be provided to the IRS if BLIPS was
10     audited or otherwise challenged.  We did this even though we
11     knew those documents contained misleading and fraudulent
12     representations.  I agreed with others that the taxpayers
13     would, if audited or otherwise challenged, provide the IRS with
14     the false representations I helped create, and I knew that the
15     purpose of those false representations was to help the taxpayer
16     evade very substantial taxes.
17             In fact, in 1999 and 2000, as part of this conspiracy,
18     I met with Larson, Pfaff, Ruble, representatives of KPMG and
19     various banks, we completed many BLIPS transactions for
20     numerous clients and generated billions of dollars in
21     fraudulent losses that we knew would be used to shelter income
22     from taxation.  Among those who used BLIPS to evade their own
23     personal taxes were John Larson, Robert Pfaff and myself.
24             In furtherance of the conspiracy I gave false and
25     misleading testimony about BLIPS in both my proffer in 2004 and
                     SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300
                                                                     22
```

```
                    09_10_07 Makov Plea
        79atmakp                   Plea
   1    in the position in 2005 by, among other things, creating the
   2    false impression that the BLIPS loans were bone fide, that they
   3    were needed for the investment part of BLIPS, and that there
   4    was a reasonable chance to make a profit when I knew none of
   5    these things were true.  Some of the things I described took
   6    place in Manhattan.
   7              THE COURT:  All right.  Thank you.
   8              Is the allocution satisfactory to the government?
   9              MR. HILLEBRECHT:  It is, your Honor.
  10              THE COURT:  One or two other things.  Mr. Makov, going
  11    back for a moment to the plea agreement, do you understand that
  12    one of the terms of this agreement is that you will forfeit to
  13    the United States the sum of $10 million?
  14              THE DEFENDANT:  I understand that, your Honor.
  15              THE COURT:  Do you understand that one of the terms is
  16    that you will file amended tax returns for the years 2000 to
  17    2002, pay all past federal and state taxes, including interest
  18    and penalties, and that you will not contest the disallowance
  19    of BLIPS-related losses claimed on those returns?
  20              THE DEFENDANT:  I do, your Honor.
  21              THE COURT:  Now Mr. Hillebrecht, this is a (C)(1)(a)
  22    plea; right?
  23              MR. HILLEBRECHT:  Sorry, your Honor, I'm not following
  24    the import of your question.
  25              THE COURT:  It's a (C)(1)(a) plea.  You're agreeing to
                      SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300
                                                                        23
        79atmakp                   Plea
   1    drop other charges.
   2              MR. HILLEBRECHT:  Yes, your Honor.
   3              THE COURT:  Now Mr. Hillebrecht, I note in the plea
   4    agreement that the $10 million forfeiture is said to represent
   5    certain proceeds to the defendant.
   6              MR. HILLEBRECHT:  Yes, your Honor.
   7              THE COURT:  Before I make a definitive determination
   8    on whether to accept the plea, I want to understand what that
   9    means and I want to understand the government's basis for
  10    agreeing to accept a forfeiture of less than all of the
  11    proceeds.
  12              MR. HILLEBRECHT:  Yes, your Honor.  It is less than
  13    the total of the proceeds but it is substantially more than the
  14    assets that Mr. Makov currently possesses.  In fact, as you'll
  15    see in the agreement, he agrees to forfeit the $10 million with
  16    the expectation it will take him time to earn money to pay
  17    that.
  18              THE COURT:  I understood that the expectation was that
  19    it was going to take him time to pay, which is not necessarily
  20    inconsistent with his having the money.  You're representing to
  21    me that he hasn't got $10 million.
  22              MR. HILLEBRECHT:  That is our understanding based on
  23    representations from the defendant.  And in the context of the
  24    underlying charging instrument, the indictment, your Honor,
  25    which doesn't have an allegation that permits us to pursue
                      SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300
                                                                        24
        79atmakp                   Plea
   1    forfeiture, doesn't have a forfeiture allegation at all, the
   2    thinking in our office was having Mr. Makov, in the context of
   3    cooperation, agreeing to forfeit $10 million -- which will come
   4    in the context of a civil forfeiture action that he agreed
```